**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE | : | **Chapter 7** |
| | : | |
| **ADENEKAN OLA-OLUWA** | : | |
| **ADESANYA & AFOLUSO** | : | |
| **ADERONKE ADESANYA,** | : | |
| | : | **Bankruptcy No. 18-17260-AMC** |
| **DEBTORS** | : | |
| _____ | : | |
| | : | |
| **NOVARTIS PHARMACEUTICALS** | : | |
| **CORP.,** | : | |
| | : | |
| **PLAINTIFF** | : | |
| | : | **Adv. Proc. No. 19-00124-AMC** |
| **V.** | : | |
| | : | |
| **ADENEKAN OLA-OLUWA** | : | |
| **ADESANYA & AFOLUSO** | : | |
| **ADERONKE ADESANYA,** | : | |
| | : | |
| **DEFENDANTS** | : | |
| _____ | : | |

Ashely M. Chan, United States Bankruptcy Judge

## OPINION

## I.    INTRODUCTION

In June 2017, the plaintiff, Novartis Pharmaceuticals Corp. ("Novartis"), obtained a

prepetition judgment ("Judgment") in the United States District Court for the District of New

Jersey ("District Court") against the debtors, Afoluso Adesanya ("Afoluso"), a former employee

of Novartis, and her husband, Adenekan Adesanya ("Adenekan," collectively with Afoluso,

"Debtors"), for fraud in connection with an employment application and resume submitted to

Novartis by Afoluso; breach of contract in connection with a relocation agreement between

Afoluso and Novartis ("Relocation Agreement"); Afoluso's breach of the duty of loyalty to

Novartis inherent in her employment contract as well as Novartis's Conflict of Interest Policy

1

("Conflicts Policy"); Afoluso's breach of contract in connection with Novartis's annual employee incentive program; sanctions issued against Afoluso for discovery misconduct and pursuing baseless claims against Novartis; and sanctions issued against Adenekan for discovery misconduct.

In this adversary proceeding, Novartis seeks to have the Judgment declared nondischargeable pursuant to § 523(a)(2)(A), § 523(a)(2)(B), and § 523(a)(6). On summary judgment, Novartis established many elements necessary to support its nondischargeability claims against the Debtors. Trial proceeded on the following remaining issues: (1) whether the portion of the Judgment attributable to fraud in connection with Afoluso's employment application and resume is nondischargeable; (2) in connection with Afoluso's breach of the Relocation Agreement, whether she knew her representation that she intended to relocate was false at the time she made it, whether she purposely made that representation intending to deceive Novartis, and whether it was justifiable for Novartis to rely on her representation that she intended to relocate; (3) in connection with Afoluso's breach of her duty of loyalty and the Conflicts Policy, whether Afoluso knew she was creating a misleading impression by failing to disclose external employment she held during her employment at Novartis and whether she purposely failed to disclose her external employment intending to deceive Novartis; (4) in connection with Afoluso's breach of the annual employee incentive program, whether Afoluso knew her failure to disclose certain conflicts of interest created a misleading impression that she was eligible for the employee incentive program when she was not and whether she purposely failed to disclose conflicts of interest in order to deceive Novartis into maintaining her incentive pay; (5) whether the conduct upon which the District Court sanctioned Afoluso satisfies the

elements of § 523(a)(6); and (6) whether the conduct upon which the District Court sanctioned

Adenekan satisfies § 523(a)(6).

For the reasons described below, the Court concludes that Novartis has established by a

preponderance of the evidence that all except a small portion of the Judgment is

nondischargeable pursuant to § 523(a)(2)(A), § 523(a)(2)(B), and § 523(a)(6).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

On February 2, 2010, Afoluso applied for a position with Novartis by submitting an

application and resume. Ex. 54; Trial Tr. 39:9-13, Jan. 14, 2021 ("Trial Tr."). According to her

application and resume, at the time she applied, she was working as the "Senior Medical

Director" of Global Drug Safety and Surveillance, Inc., a/k/a LaRon Pharma, Inc. ("Global

Drug" or "LaRon"), a sub-S corporation engaged in licensing, developing, and marketing

prescription drugs of other pharmaceutical companies for four therapeutic groups, including

oncology. Ex. 54; Ex. 4 at 3. Her application and resume also reflected that she had previously

worked for Johnson & Johnson as a senior director of "Benefit Risk Management"; Teva North

America ("Teva") as a director and "Head of Global Drug Safety and Pharmacovigilance"; and

Eli Lilly & Company ("Eli Lilly") as a medical director in pharmacovigilance. Ex. 54. On her

application, Afoluso certified that "the information contained in this application is correct to the

best of my knowledge and [I] understand that falsification of any information is grounds for

immediate dismissal in accordance with Novartis Pharmaceuticals Corporation policy" and that

"I also understand that all employment offers are contingent upon the satisfactory results of the

company's background check procedures and medical examination…" *Id.* However,

unbeknownst to Novartis, Afoluso had misrepresented her employment history on her job

3

application by inflating prior salaries, creating "phony" supervisors, and concealing that she had been involuntarily terminated from a prior position.[1] Ex. 4[2] at 2.

By the time Afoluso applied to work for Novartis, she and Adenekan had judgments in mortgage foreclosure entered against two of their properties located at 2510 Peachtree Drive, Perkasie, PA ("Perkasie Property") and 910 West Marshall Street, Norristown, PA ("Norristown Property") for failure to make monthly mortgage payments. Ex. 13-17. In late October 2009, a foreclosure judgment in the amount of $292,076.63 had been entered against the Perkasie Property. Ex. 13, 15. By January 25, 2010, just several weeks prior to Afoluso applying for a position at Novartis, a foreclosure judgment in the amount of $182,162.13[3] was entered against the Norristown Property. Ex. 16, 17.

On March 1, 2010, Novartis sent Afoluso a letter offering her the position of Brand Safety Leader in its Oncology Business Unit ("Offer Letter"). Ex. 4 at 2; Ex. 51. The Offer Letter mentioned, in relevant part, that should she accept the offer, Novartis would help her relocate closer to Novartis's offices in New Jersey. Ex. 51. It also mentioned the potential for Afoluso to participate in Novartis's Annual Incentive Program ("AIP") depending on the company's and Afoluso's performances, as well as Afoluso meeting certain eligibility requirements. *Id.*

---

[1] Afoluso represented that at Global Drug, her starting salary in 2007 was $220,000 in base pay and $66,000 in bonuses, and that her then-current salary was $240,000 in base pay and $75,000 in bonuses. Ex. 54; Trial Tr. 169:1-10. Above the section entitled "Annual Salary" for her current position, she wrote "Target 30%." Ex. 54. It is unclear whether "Target 30%" refers to her starting salary, her current salary, or both. Global Drug's tax returns for 2009 and 2010 ultimately reflect that Global Drug paid no salaries whatsoever in those years. McCusker Decl. Ex. B, C.

[2] As discussed in this Court's opinion granting in part and denying in part Novartis's and the Debtors' motions for summary judgment in this adversary proceeding, the historical facts established in the District Court Action which Novartis already proved and which were essential to the District Court's decision cannot be relitigated. Ex. 7 at 24. *See also J&V Developers, Inc. v. Malloy (In re Malloy),* 535 B.R. 81, 94 n.21 (Bankr. E.D. Pa. 2015) (J. Frank). Such findings of fact in the prior proceeding may in the aggregate establish any or all of the elements of a section 523(a) claim as a matter of law. *In re Malloy,* 535 B.R. at 94 n.21.

[3] The judgment amount was later amended to $187,711.59. Ex. 16, 18.

On March 3, 2010, Afoluso signed the Offer Letter to accept the position. *Id.* The same

day, she signed a series of forms, including a statement that

> I acknowledge that I have received and read copies of the Novartis Pharmaceuticals
> Corporation Code of Conduct and the Novartis Policy on Corporate Citizenship. I
> understand the obligations that these policies place upon me, and have had any questions
> answered to my satisfaction. I understand that compliance with these policies, including
> the obligation to report any violations, is a condition of my employment with the
> Company.[4] Ex. 82.

She also signed an "Employee Agreement" stating, in relevant part,

> [i]n consideration of my employment or continued employment at will by Novartis
> Pharmaceuticals Corporation…and the salary, benefits or other compensation to be paid
> for my services during my employment with Novartis, I agree as follows: During my
> employment by Novartis, I will devote my best efforts and full business loyalty to my
> employment with Novartis. I will comply with its policies and practices, including,
> without limitation, the Code of Conduct and Corporate Citizenship Policy as these
> policies may be revised from time to time. I acknowledge that I have received copies of
> the Novartis Code of Conduct and Corporate Citizenship Policy and that I have read these
> policies prior to executing this agreement. I will hold no other employment or engage in
> any other business which may adversely affect my ability to perform my job
> responsibilities at Novartis. Ex. 52 ¶ 1.

Finally, Afoluso also signed the Relocation Agreement on March 3, 2010. Ex. 8. Afoluso's

employment with Novartis was predicated on her relocating from her home in Pennsylvania,

located at 389 Highgate Drive, Ambler, PA ("Residence"), where she has resided since 2003, to

a location closer to Novartis's offices in New Jersey. Ex. 4 at 4; Trial Tr. 68:18-69:1.

To help facilitate her move, Novartis gave Afoluso approximately $26,000 in relocation

funds after Afoluso executed the Relocation Agreement. Ex. 4 at 4, 20. Novartis also had a

contract with a relocation vendor, Cartus, to assist employees with relocating. Trial Tr. 43:14-19;

Ex. 9 at 1 ("Novartis…has partnered with Cartus, as well as a number of other top rated service

providers, to provide you with a program of relocation support to reduce normal move

---

[4] After receiving the Code of Conduct and training on it upon their hire, Novartis employees are generally re-trained on it annually. Trial Tr. 24:22-25:17, 33:19-34:2.

disruptions, and enable you to get settled in your new home and job as quickly as possible."). However, despite acknowledging that the Relocation Agreement required her to relocate within twelve months of her hire, Afoluso, who at the time, had three school-aged children, never relocated from her home and, in fact, worked almost exclusively from her Pennsylvania Residence during the entirety of her tenure at Novartis. Ex. 4 at 4, 20; Trial Tr. 73:12-19, 143:18-20.

Unbeknownst to Novartis, from the very start of her employment and throughout her tenure with Novartis, Afoluso and her husband actually jointly *owned* Global Drug. Ex. 4 at 3. By virtue of her 50% ownership interest in this specialty pharmaceutical company, Afoluso had been in violation of the Employee Agreement, Novartis's Conflicts Policy, and the AIP from the outset of her employment and through her entire tenure at Novartis. *Id.*

On July 6, 2010, a few months after starting her employment with Novartis, a mortgage foreclosure judgment in the amount of $109,380.70 was entered against one of the Debtors' properties located at 5073 McKean Avenue, Philadelphia, PA ("Philadelphia Property"). Ex. 19, 20, 21.

In August 2011, unbeknownst to Novartis, Afoluso obtained a position as a drug safety consultant with Biomedical Consulting International, Inc. ("Biomedical"). Ex. 4 at 4. While working for Biomedical, she provided drug safety services to Auxilium Pharmaceuticals ("Auxilium"). *Id.* Through her work with Auxilium, Afoluso provided drug safety services to direct competitors of Novartis. *Id.* Auxilium required an average weekly commitment of ten hours from Afoluso, although, at times, she billed over one hundred hours a month to that company. *Id.* Between 2011 and 2012, Afoluso received $59,189.00 on account of her work for Biomedical and Auxilium. *Id.*

On December 29, 2011, the Bank of New York Mellon ("Mellon"), the holder of a

mortgage against the Residence, filed a complaint in mortgage foreclosure against the Residence

alleging unpaid monthly mortgage payments. Ex. 22, 23. Only weeks later, in January 2012,

Afoluso, using the alias Ron Nuga, M.D., began providing drug safety services to Astellas

Pharma Global Development, Inc. ("Astellas") without informing Novartis. Ex. 4 at 4. Around

the same time, on January 27, 2012, Afoluso completed the 2011 Code of Conduct training for

non-sales associates. Ex. 55. The 2011 Code of Conduct states, in relevant part,

> [e]ach employee must observe a duty of undivided loyalty to the Company, free
> from any potential personal or private business interests that might adversely
> influence his or her judgment. Employees are expected to avoid situations even
> where there may be only an appearance of a conflict of interest. Any time an
> employee wants to engage in an activity that could possibly be construed as a
> conflict of interest, he or she must disclose it in writing in accordance with the
> Company's Conflict of Interest Policy and obtain the Company's consent and
> abide by any conditions required by the Company. Employees are expected to
> familiarize themselves with all details of the Company's Conflict of Interest
> Policy. Ex. 83 at 2-3.

The Code of Conduct then went on to summarize "some of the salient provisions" of the

Conflicts Policy, including:

> [e]mployees may not have a second job with or provide services to a competitor
> of the Company, nor own any interest in any company which competes or does
> business, with the Company. This prohibition applies whether the ownership is
> direct or indirect, or is maintained by the employee, a spouse or other family
> member…Neither an employee nor his or her family member may act in any
> capacity for any supplier, contractor, subcontractor, customer, consultant or other
> entity that does or seeks to do business with the Company, is a competitor of the
> company, has a significant relationship with the Company or with the Company's
> competitors, suppliers or customers…Employees may not engage in any outside
> employment or other activity which encroaches on the time or attention that
> should be devoted to the Company's affairs or detracts from their ability to
> perform their responsibilities with full loyalty to the Company. *Id.* at 3.

The Code of Conduct also imposes an obligation on its employees to "report to the Company any

actual or apparent violations of law or ethical standards so that they can be investigated and dealt

with appropriately." *Id.* at 5. In fact, it specifically states that "anyone aware of a violation owes

a duty to the Company…to disclose it." *Id.* The Code of Conduct similarly makes clear that

> [a]dherence to our Code of Conduct is a condition of employment. Any violation
> of your obligations under the Code of Conduct may subject you to disciplinary
> measures, including possible termination of your employment. Additionally, your
> employment with the Company and the Company's payment of any incentive
> and/or bonus compensation are conditioned on your compliance with applicable
> laws and with associated Company policies. Accordingly, if you are found by the
> Company to have violated the law or any material provision of any Company
> Policy…you will not earn or receive any incentive bonus compensation for any
> period in which such violation(s) occurred or were discovered. In addition to any
> other remedy that the Company may have for damages, if you fail to repay any
> such incentive or bonus compensation paid to you, the Company may file a
> lawsuit against you for recovery of the amount of such incentive or bonus
> compensation plus costs and fees incurred in pursuing the lawsuit. *Id.* at 7.

From January 2012 through February 2013, during litigation of Mellon's foreclosure

complaint against the Residence, Afoluso worked approximately forty hours per week for

Astellas, earning approximately $500,000 total, and traveled to Astellas's Illinois headquarters

on at least five occasions. Ex. 4 at 4. *See* Ex. 25 (foreclosure judgment entered against the

Residence in the amount of $1,652,217.88 in April 2016). In April 2012, Novartis's human

resources business partner instructed Afoluso that she would have to come into the office more

frequently. Ex. 4 at 5. Her performance reviews reflected that her limited time in Novartis's

offices was negatively impacting her team. *Id.* at 4. Around the same time that Novartis was

attempting to have Afoluso come into the office more frequently, Afoluso was billing hundreds

of hours to her other consulting jobs. *Id.* at 5. In June 2012, while still engaged in external

employment, Afoluso completed the 2012 Code of Conduct training. *Id.* at 4; Ex. 55.

Ultimately, Afoluso failed to satisfactorily adjust her schedule, and continued to work

from the Residence. Ex. 4 at 5. As a result, in March 2013, Afoluso was warned that her

absences were unacceptable. *Id.* Subsequently, Afoluso's employment with Novartis was

terminated effective September 2013. *Id.* The reason given for her termination was "performance based, predominantly driven about not coming into the office three days a week, which impacted her interactions and collaboration with her close functional team members." *Id.* During her tenure at Novartis, Afoluso earned a total of $1,205,720 in cash compensation, including $210,403 in bonuses under the AIP. *Id.* at 5-6.

Shortly thereafter, on September 19, 2013, Afoluso initiated an action in the District Court against Novartis alleging claims of discrimination and retaliation under state and federal law ("District Court Action"). *Id.* at 6. On May 27, 2015, Novartis filed several counterclaims against Afoluso, including fraud on Afoluso's employment application and resume ("Count I"), fraud in connection with the Relocation Agreement ("Count II"), breach of the Relocation Agreement ("Count III"), breach of Novartis's AIP ("Count IV"), breach of the duty of good faith and fair dealing ("Count V"), and breach of the duty of loyalty and Novartis's Conflicts Policy ("Count VIII") (collectively, "Counterclaims").[5] *Id.*

After a discovery period which the District Court described as "contentious" and "marked by delay," Novartis filed an omnibus motion for sanctions and summary judgment, seeking, in relevant part, judgment in favor of Novartis on the Counterclaims; dismissal of Afoluso's claims as a sanction for discovery obstruction, deceit, fraud, and the pursuit of baseless litigation; and sanctions against Adenekan on account of his discovery misconduct. *Id.* at 1, 6, 9, 13, 15. Afoluso filed an opposition, which contained an opposition brief from Adenekan, as well as her own cross motion for summary judgment on the Counterclaims. *Id.* at 1, 9.

In an opinion issued on August 15, 2016 ("First District Court Opinion"), the District Court, in relevant part, granted Novartis's summary judgment motion in connection with Counts

---

[5] Novartis had also brought counterclaims for unjust enrichment and misappropriation of confidential proprietary information, which are not relevant to this proceeding. Ex. 4 at 6.

I, III,[6] IV, V, and VIII; sanctioned Afoluso by dismissing her claims; and sanctioned Adenekan. *Id.* at 2.

In connection with Count I for fraud related to Afoluso's employment application and resume, the District Court concluded that, when applying for a position with Novartis, Afoluso made misrepresentations on her application and resume regarding her last job, her supervisor, and prior salaries; that she must have known that she was misstating material aspects of her employment history since she knows her own employment history; that she intended Novartis would rely on her misrepresentations in determining whether to hire her; and because she was required to certify the application was correct and acknowledge that falsification would be a ground for immediate dismissal, it was reasonable for Novartis to rely on the accuracy of the information provided by Afoluso. *Id.* at 19. In fact, the District Court specifically found that Novartis had relied on misrepresentations in her employment application and resume when determining whether to hire her and what compensation to offer. *Id.* It further found that Afoluso's misrepresentations damaged Novartis by causing it to hire a candidate it otherwise would not have hired and to pay her more than her experience warranted. *Id.*

Therefore, the District Court concluded that the foregoing findings satisfied all the elements for New Jersey common law fraud, which requires "(1) a material misrepresentation of presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Id.*

---

[6] Because the District Court found that "Counts Two and Three share the same core essential facts," the District Court deemed "Count Two to be part of Count Three" and, accordingly, dismissed as moot Novartis's motion for summary judgment and Afoluso's cross motion for summary judgment as to Count Two. Ex. 4 at 19 n.18.

In connection with Count III for breach of the Relocation Agreement, the District Court concluded that Afoluso had represented to Novartis that she intended to relocate, accepted approximately $26,000 in relocation funds, and never relocated. *Id.* at 20. Novartis lost the money it gave Afoluso to move and never received the benefit of having her move closer to the office. *Id.*

In connection with Count IV for breach of the AIP, the District Court concluded that Novartis and Afoluso entered into an employment contract on March 3, 2010 when she signed Novartis's employment offer; that the terms of her employment were governed by Novartis's Code of Conduct, Conflicts Policy, and the AIP; and that the bonuses she received through the AIP were conditioned upon her compliance with Novartis's policies, including the Conflicts Policy. *Id.* Additionally, the District Court found that, by accepting employment with Biomedical, Auxilium, and Astellas, Afoluso violated the Conflicts Policy and breached her obligations under the AIP, requiring her to return funds paid pursuant to that program. *Id.* at 20-21.

In connection with Count VIII for breach of the duty of loyalty and Conflicts Policy, the District Court concluded that Afoluso had violated her common law duty of loyalty and the Conflicts Policy by soliciting and accepting consulting positions with Novartis competitors and by billing hundreds of hours to them without disclosure to Novartis, resulting in her impermissibly competing with her employer and dividing the loyalty she owed Novartis. *Id.* at 23. Ultimately, the District Court determined that Novartis was harmed because it had paid Afoluso for a full-time position while she "siphoned off time she owed Novartis to other activities. As such Defendant [Novartis] lost the money it paid her for time she did not commit to the company." *Id.*

In ruling on Novartis's motion for sanctions, the First District Court Opinion also made

certain findings regarding Afoluso's and Adenekan's conduct during the District Court Action.

*Id.* at 6-8. Specifically, with regard to Afoluso, the District Court found that

> [p]laintiff provided false and misleading written responses to discovery requests
> and deposition testimony, such as: 1) claiming that her 'sole compensation and
> income during her employment with Defendant [Novartis] came from Defendant;'
> 2) denying that she worked for other entities while working for Novartis; and 3)
> claiming that her interest in LaRon ended in 2009. *Id.* at 6-7 (citations omitted).

In granting Novartis's motion for sanctions against Afoluso, the District Court invoked its

inherent power to sanction litigation abuses, finding that "[a] court may sanction a responsible

party when it finds that 'fraud has been practiced upon it'" and that "'[f]raud on the court occurs

where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion

some unconscionable scheme' that interferes with the court's ability 'to impartially adjudicate a

matter by improperly influencing the trier or unfairly hampering the presentation of the opposing

party's claim or defense.'" *Id.* at 9. The District Court noted that before dismissing a case as a

sanction, the court must consider:

> (1) the existence of certain extraordinary circumstances, (2) the presence of
> willfulness, bad faith, or fault by the offending party, (3) the consideration of
> lesser sanctions to rectify the wrong and to deter similar conduct in the future,
> (4) the relationship or nexus between the misconduct drawing the dismissal
> sanction and the matters in controversy in the case, (5) prejudice and the public
> interest, and (6) the degree of the wrongdoer's culpability. *Id.* at 10.

In justifying its decision to dismiss Afoluso's discrimination and retaliation claims, the District

Court found:

> Plaintiff's [Afoluso] suit is extraordinary in that it is predicated on a willful,
> determined effort by Plaintiff to deceive Defendant [Novartis] and this Court.
> Plaintiff misstated her employment history, outside consulting, sources of income,
> business interests and even her name when it suited her purpose. This Court also
> finds that Plaintiff's conduct was willful and in bad faith. Her deposition
> testimony and written responses to discovery requests were false and contradict
> the information uncovered by defense counsel. This is not a case of forgetfulness

12

or confusion. This is perjury. There is a clear connection between Plaintiff's obfuscation and the matters in controversy in this case – namely Plaintiff's contractual obligations to Defendant and the basis for her termination. Further, Defendant has been prejudiced by Plaintiff's interference in the discovery process. By giving false answers and refusing to turn over documents, Plaintiff forced Defendants to issue and defend third-party subpoenas and incur additional effort and expense to obtain information that Plaintiff possessed and should have provided. Plaintiff is entirely culpable in this matter. She had every opportunity to tell the truth and cooperate in discovery and chose not to. *Id.* at 13-14.

Ultimately, the District Court determined that "[g]iven the brazen manner in which Plaintiff attempted to mislead defense counsel and manipulate the judicial process, this Court does not believe that a lesser sanction [than dismissal of her claims] will deter Plaintiff from future improper conduct." *Id.* at 14.

With regard to Adenekan, the District Court noted that during discovery, Adenekan refused to provide documents demanded by subpoena, forcing Novartis to file a motion to compel, which the District Court granted on October 6, 2015, ordering Adenekan to produce the documents by October 21, 2015. *Id.* at 7. He failed to do so. *Id.* Subsequently, on October 30, 2015, the District Court again instructed Adenekan to produce the documents, and "granted Defendant [Novartis] leave to file for sanctions for fees if Mr. Adesanya did not do so." *Id.* As of the date the First District Court Opinion was issued, Adenekan still had not complied with Novartis's document demands or the District Court's orders compelling production of the documents Novartis had requested. *Id.* at 7, 15-16. Furthermore, at his deposition, Adenekan gave false testimony, representing that (1) Afoluso had no affiliation with any efforts of LaRon while she worked for Novartis despite tax returns identifying her as a half-owner of LaRon and (2) that Astellas had hired him and not Afoluso despite proof from Astellas that it had hired Afoluso. *Id.* at 8, 16.

In deciding to sanction Adenekan, the District Court noted that it has inherent power to sanction non-parties who have a substantial interest in the outcome of the litigation and who substantially participated in the proceedings in which they interfered, finding that sanctionable conduct by a non-party could include failure to appear, destruction of evidence, or giving false, misleading, and materially incomplete testimony. *Id.* at 10-11. Because Adenekan had "refused both defense requests and three separate court orders to turn over documents relevant to the issues in this case" and gave false testimony, the District Court found that sanctions against Adenekan were warranted. *Id.* at 15, 16. In fact, the District Court noted that "[w]hen asked for relevant documents regarding LaRon or Ron Nuga LLC, Mr. Adesanya certified that he and his wife did not possess any, even though there were thousands located in their home." *Id.* at 7 n.11.

Subsequently, Novartis filed an application for an award of damages for the Counterclaims as well as for an award of reasonable attorneys' fees and costs incurred in connection with dismissal of Afoluso's claims and Adenekan's discovery misconduct ("Application"). Ex. 5 at 1. The Debtors filed an opposition in response. *Id.*

On June 5, 2017, the District Court issued an opinion granting the Application with reductions ("Second District Court Opinion," collectively with First District Court Opinion, "District Court Opinions"). *Id.* at 1. The District Court noted, "[a]fter finding that Plaintiff [Afoluso] willfully deceived Novartis and this Court in bad faith and manipulated the judicial process, this Court dismissed the Complaint…and awarded sanctions against the Adesanyas." *Id.* at 2.

After conducting a comprehensive review of the reasonableness of the requested attorneys' fees and costs, the District Court determined that a total award of $480,754.22 on account of services performed in connection with the dismissal of Afoluso's claims and the

motion for sanctions against Adenekan was reasonable. *Id.* at 3, 4-17, 26. In making this determination, the District Court stated "one exception to this general rule [that fees and costs incurred in litigation are usually not recoverable] is when 'a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' 'In this regard, if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party.'" *Id.* at 7.

With respect to Afoluso, the District Court noted that "Plaintiff's dogged pursuit of baseless claims and fraud led to the dismissal of the Complaint." *Id.* at 8. Thus, Novartis was entitled to be compensated for fees and costs incurred as a result of that and Afoluso's obfuscation of discovery. *Id.* at 8, 11. With respect to Adenekan, the District Court noted "[t]his Opinion focuses on the fees and costs incurred in relation to Mr. Adesanya's false testimony and his failure to comply with Defendant's document demands." *Id.* at 8. The District Court allocated $457,040.22 of the attorneys' fee award against Afoluso and $23,714 of the attorneys' fee award against Adenekan "for the fees and costs incurred regarding the dismissal of Plaintiff's claims and sanctions against Mr. Adesanya." *Id.* at 17, 26.

In determining damages for Count I, the District Court awarded $658,788.96 to compensate Novartis for hiring and paying Afoluso more than her experience warranted based upon its calculation of the benefit Novartis would have realized had the representations which induced it to hire Afoluso been true. *Id.* at 19-22, 26.

In determining damages for Count III, the District Court awarded $26,818.71, the amount Afoluso received under the Relocation Agreement. *Id.* at 22, 26.

In determining damages for Count IV, the District Court awarded $210,403, representing full repayment of all bonuses Afoluso received during her employment with Novartis under the

AIP, constituting $57,605 received in 2011; $70,343 received in 2012; and $82,455 received in 2013. *Id.* at 22-23, 26. The District Court reasoned that "Plaintiff's bonuses were conditioned upon her compliance with Novartis's internal rules and policies, including the Conflicts Policy, and she was in violation of these policies at the outset of her employment," and that "[t]his Court previously found that Plaintiff was in violation of these policies from the very start of her employment and breached the AIP by accepting outside employment positions with Biomedical/Auxilium and Astellas." *Id.* at 22-23.

Finally, in determining damages for Count VIII, the District Court awarded $497,907.56, representing the "wrongful" profits Afoluso had obtained working for Biomedical, Auxilium, and Astellas. *Id.* at 24, 26.

Accordingly, in an order dated June 21, 2017, consistent with the Second District Court Opinion, the District Court entered judgment (1) against Afoluso in the total amount of $1,850,958.45, consisting of $457,040.22 attributable to attorneys' fees and costs, plus applicable post-judgment interest, and $1,393,918.23 in damages, plus applicable post-judgment interest, and (2) against Adenekan in the amount of $23,714, plus applicable post-judgment interest.[7] Ex. 6.

On November 2, 2018, Afoluso and Adenekan filed a joint chapter 13 bankruptcy petition. Case No. 18-17260 ECF No. ("ECF") 1. Their case was subsequently converted to a chapter 7 case on February 26, 2019. *Id.* at ECF 34. On June 7, 2019, Novartis filed the instant adversary complaint seeking to have the Judgment declared nondischargeable pursuant to §523(a)(2)(A) ("Adversary Complaint"). Case No. 19-00124 ECF 1 Compl. ¶ 38. On December

---

[7] Later, the Judgment was affirmed on appeal by the Third Circuit Court of Appeals and Novartis successfully moved the Judgment to the Court of Common Pleas of Montgomery County, Pennsylvania ("CCP"). *See* Ex. 80; Ex. 78. The CCP's denial of Afoluso and Adenekan's challenge to the transfer of the Judgment was affirmed on appeal by the Pennsylvania Superior Court. Ex. 79.

12, 2019, Novartis filed a motion for summary judgment and supporting brief. Case No. 19-00124 ECF 20-21. After the Court granted the Debtors' request for additional time to respond, the Debtors filed a response in opposition to Novartis's motion for summary judgment and their own cross motion for summary judgment on January 22, 2020. *Id.* at ECF 26, 29, 30.

On March 24, 2020, the Court entered an order granting in part and denying in part Novartis's motion for summary judgment and granting in part and denying in part the Debtors' cross motion for summary judgment ("Adversary Summary Judgment Order"). *Id.* at ECF 54, 55. The Court incorporates the opinion it issued in connection with the Adversary Summary Judgment Order explaining the basis for its decision and the remaining issues for trial by reference ("Adversary Summary Judgment Opinion"). *See id.* at ECF 54; Ex. 7 (hereinafter referred to as "Adv. Summ. J. Op."). Ultimately, the Court concluded that:

> [b]ecause there remains a genuine dispute regarding whether, in connection with Counts III, IV, and VIII [for breach of the Relocation Agreement, the AIP, and duty of loyalty and Conflicts Policy, respectively], Afoluso knowingly advanced a misleading understanding of her employment status through her representations and omissions and whether she made those representations and omissions with the intent and purpose of deceiving Novartis, summary judgment will be denied as to both those elements in favor of further exploration at trial. Furthermore, a genuine dispute of material fact remains over Novartis's reliance on Afoluso's representations in the Relocation Agreement for Count III. Adv. Summ J. Op. 20.

On April 23, 2020, Novartis filed a motion seeking to amend the Adversary Complaint primarily to assert causes of action based on § 523(a)(2)(B) for the portion of the Judgment attributable to fraud on Afoluso's employment application and resume and § 523(a)(6) for the portion of the Judgment attributable to the sanctions awards against Afoluso and Adenekan. Case No. 19-00124 ECF 62 Mot. to Am. Ex. A ¶¶ 58, 67, 105, 108, 110, 119. On May 13, 2020, the Court granted Novartis's motion to amend the complaint. Case No. 19-00124 ECF 70. On May

15, 2020, Novartis filed its amended complaint ("Amended Adversary Complaint"), which the

Debtors answered on May 29, 2020. *Id.* at ECF 71, 80.

On January 14, 2021, trial was held over Zoom. *Id.* at ECF 152; Trial Tr. 1. Based upon

her conduct at trial, the Court finds Afoluso severely lacking in credibility as a witness. For

instance, due to the virtual format, which allowed Adenekan and Afoluso to sit next to each other

throughout the trial, Afoluso appeared to receive coaching from Adenekan as he whispered to

Afoluso during her testimony multiple times, forcing the Court to admonish Adenekan that he

was not permitted to give Afoluso answers or correct her during her testimony. *See* Trial Tr.

74:22-75:5, 124:23-125:11, 153:5-18. Furthermore, even when not being coached, Afoluso came

across as evasive, argumentative, and defensive. She repeatedly refused to answer Novartis's

questions until admonished by the Court to do so and, even then, claimed lack of recall for

substantially all of Novartis's questions, behavior consistent with her conduct during discovery

in the District Court Action. *See e.g.,* Trial Tr. 68:2-13, 70:24-71:25, 74:2-7, 74:17-21, 76:4-

77:25, 78:12-79:10, 85:1-86:24, 90:2-92:10, 93:24-94:5, 94:12-25, 95:1-18; Ex. 80 at 3 ("Both

[Afoluso and Adenekan] were extremely evasive during their depositions and refused to answer

questions or claimed a lack of recall."). Rather than providing straightforward answers to

Novartis's questions, she repeatedly opted to confront Novartis over the point of its questions

instead. *See e.g.,* Trial Tr. 68:2-7, 74:8-11, 78:12-16, 85:1-86:24, 94:8-24. Overall, her testimony

was incredibly self-serving and, at times, even contradictory. *See e.g.,* Trial Tr. 177:7-15,

178:22-179:14, 179:20-180:13, 185:2-8. She even admitted that certain discovery responses she

had given in the District Court Action were not true. *See e.g.,* Trial Tr. 99:22-104:7, 104:13-

105:13.

At the conclusion of the trial, both parties requested the opportunity to submit supplemental post-trial briefing. Trial Tr. 219:10-220:24. Accordingly, the Court set a schedule for the parties to file their submissions. *Id.* at 222:3-23. On February 12, 2021, the Debtors submitted their post-trial brief. Case No. 19-00124 ECF 160. On February 16, 2021, Novartis submitted its post-trial brief. *Id.* at ECF 158.

## III.   DISCUSSION

Ultimately, the Court concludes that the portion of the Judgment attributable to Afoluso's fraud on the application and resume she submitted to Novartis is nondischargeable pursuant to §523(a)(2)(B) because the First District Court Opinion already established substantially all elements required for a debt to be declared nondischargeable under § 523(a)(2)(B), and the evidence at trial supports the remaining elements.

The Court also finds that the portion of the Judgment attributable to Afoluso's breach of the Relocation Agreement is nondischargeable pursuant to § 523(a)(2)(A) because, despite never having any intention of relocating, Afoluso falsely represented that she did with the purpose of deceiving Novartis into distributing additional funds to her. Furthermore, Novartis's reliance on her representation that she would move was justifiable.

Additionally, the portion of the Judgement attributable to Afoluso's breach of the Conflicts Policy and duty of loyalty is nondischargeable pursuant to § 523(a)(2)(A) because Afoluso knew from the outset of her employment with Novartis that her employment was conditioned on her not holding other jobs which would interfere with her employment at Novartis, allowing the Court to infer that she failed to disclose her other outside consulting jobs with the intent and purpose of deceiving Novartis so that she could keep her job with Novartis and her other pharmaceutical positions in order to maximize her compensation.

Similarly, the portion of the Judgment attributable to Afoluso's breaches of the AIP occurring subsequent to 2011 is nondischargeable pursuant to § 523(a)(2)(A) because she was aware after 2011 that her external employment and undisclosed ownership interest in Global Drug rendered her ineligible to receive incentive pay but she, nevertheless, failed to disclose her outside consulting positions or her ownership interest in Global Drug with the intent and purpose of deceiving Novartis into maximizing her compensation. However, the $57,605 portion of the Judgment attributable to Afoluso's 2011 breaches of the AIP are dischargeable due to lack of evidence at trial that Afoluso knew prior to 2012 that she was creating a misleading impression that she was eligible for the AIP when she was not.

Finally, the Court concludes that § 523(a)(6) renders the portions of the Judgment attributable to the sanctions awards against Afoluso and Adenekan nondischargeable because the District Court Opinions established that Afoluso and Adenekan willfully and maliciously committed fraud on the District Court and obstructed discovery by giving false testimony and withholding requested documents without excuse.

### A. The Portion of the Judgment Attributable to Fraud on Afoluso's Employment Application and Resume Is Nondischargeable Pursuant to §523(a)(2)(B).

Novartis avers that the portion of the Judgment attributable to the fraud on Afoluso's job application and resume is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B). Section 523(a)(2)(B) provides that a debtor is not discharged from a debt

> for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by…use of a statement in writing - (i) that is materially false; (ii) respecting a debtor's…financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) the debtor caused to be made or published with intent to deceive. *See* Am. Compl. ¶¶ 57-58.

Exceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors. *Law Offices of William C. Courtney, LLC v. Williams (In re Williams)*, Case No. 15-33283 (MBK), Adv. Pro. No. 16-01200 (MBK), 2018 Bankr. LEXIS 3246, at *16 (Bankr. D. N.J. Oct. 12, 2018). To succeed on a § 523(a)(2)(B) claim, the plaintiff must show by a preponderance of the evidence (1) a materially false writing; (2) respecting the debtor's financial condition; (3) which was reasonably relied on; and (4) was made with intent to deceive. *Id.*

The reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard based upon the degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances. *In re Piazza,* 605 B.R. 332, 339 (Bankr. M.D. Pa. 2019) (citing *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1117-18 (3d Cir. 1995)). Additionally, because a debtor will rarely, if ever, admit that deception was his purpose, intent to deceive may be inferred from the totality of the surrounding facts and circumstances. *Fulton, N.A. v. Robbins (In re Robbins)*, 562 BR. 83, 109 (Bankr. E.D. Pa. 2016); *Giansante & Cobb, LLC v. Singh (In re Singh)*, 433 BR. 139, 161 (Bankr. E.D. Pa. 2010). In fact, "a creditor can establish intent to deceive by proving reckless indifference to, or reckless disregard of, the accuracy of the information in the financial statement of the debtor when the totality of the circumstances supports such an inference." *In re Williams*, 2018 Bankr. LEXIS 2039, at *39.

In the Adversary Summary Judgment Opinion, this Court already determined that "the false statements that Afoluso made on her employment application regarding her salaries and employment history relate to her financial condition, even though they do not relate to her overall financial status." Adv. Summ. J. Op. 28. Additionally, the First District Court Opinion's finding that Afoluso committed New Jersey common law fraud in connection with her

21

employment application and resume establishes substantially all of the other elements necessary

for a § 523(a)(2)(B) claim. *See* Ex. 4 at 18-19. As this Court discussed in the Adversary

Summary Judgment Opinion,

> [i]t is well established that preclusion principles apply in bankruptcy proceedings.
> *Murphy v. Snyder (In re Snyder)*, 939 F.3d 92, 100 (2d Cir. 2019). Because the
> Judgment was rendered in a federal court, the Court must apply federal principles
> of collateral estoppel to determine the Judgment's preclusive effect in this
> proceeding. *In re Snyder*, 939 F.3d at 100; *Wolstein v. Docteroff (In re Docteroff)*,
> 133 F.3d 210, 214 (3d Cir. 1997). Under federal law, collateral estoppel precludes
> the re-litigation of an issue of fact or law determined in a prior action if the
> following conditions are satisfied: (1) an identical issue was raised in a prior
> proceeding; (2) the issue sought to be precluded was actually litigated and decided
> in the prior action; (3) the determination of the issue sought to be precluded was
> essential to supporting a valid and final judgment on the merits in the prior
> proceeding; and (4) the party against whom preclusion is asserted had a full and
> fair opportunity to litigate the issue in the prior proceeding. *In re Snyder*, 939 F.3d
> at 100; *United States ex rel. Doe v. Heart Sol. PC*, 923 F.3d 308, 316 (3d Cir.
> 2019); *Heine v. Comm'r of the Dep't of Cmty. Affairs*, 337 F. Supp. 3d 469, 482
> (D. NJ. 2018).
>
> In the context of dischargeability proceedings, collateral estoppel permits the
> court to accept facts established by previous judgment as evidence of
> nondischargeability. *In re Docteroff*, 133 F.3d at 215 (citing *In re Halpern*, 810
> F.2d 1061, 1064 (11th Cir. 1987)). Upon application of collateral estoppel in a
> nondischargeability action, the Court must determine whether a judgment entered
> in a prior proceeding and the accompanying underlying findings are sufficient to
> render a debt nondischargeable. *Aiello v. Aiello (In re Aiello)*, 533 BR. 489, 494-
> 95 (Bankr. W.D. Pa. 2015). Adv. Summ. J. Op. 23-24.

According to the First District Court Opinion, New Jersey common law fraud requires "(1) a

material misrepresentation of presently existing or past fact; (2) knowledge or belief by the

defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance

thereon by the other person;[8] and (5) resulting damages."[9] Ex. 4 at 19 (citing *Farris v. County of Camden,* 61 F. Supp. 2d 307, 340 (D. N.J. 1999)).

The First District Court Opinion determined that Afoluso's written employment application and resume (1) contained statements about her employment and salary history that were materially false; (2) Novartis relied on these representations in determining whether to hire her and in preparing a compensation package; (3) Afoluso knew her own employment history and would have known she was misstating material aspects of it on her written application; and (4) Afoluso intended Novartis to rely on her misrepresentations since she was trying to obtain employment. *Id.*

The foregoing findings are identical to the findings this Court would need to make to support a determination of nondischargeability under § 523(a)(2)(B), were actually litigated and decided, were essential to supporting the Judgment, and Afoluso had a full and fair opportunity to litigate them in the District Court Action. As a result, as the Court recognized in the Adversary Summary Judgment Opinion, collateral estoppel binds this Court to accept those findings.[10] *See* Adv. Summ. J. Op. 28.

---

[8] Under New Jersey common law, a party will generally be said "to have reasonably relied on a misrepresentation where 'the facts to the contrary were not obvious or did not provide a warning, or where the relying party [reasonably] did [] not pursue further investigation that would have revealed the falsity of the representation.'" *Discover Growth Fund, LLC v. Fiorino,* Civ. Act. No. 20-00351, 2021 WL 236595, at *4 (D. N.J. Jan. 25, 2021). Similarly, "reliance on a misrepresentation is not reasonable or justifiable if the recipient 'knows that it is false or its falsity is obvious to him.'" *Square Two, LLC v. JJJ Solutions, LLC,* Case No. A-3065-18, 2021 WL 851091, at *7 (N.J. Sup. Ct. App. Div. March 8, 2021). New Jersey does not impose upon a party to an arm's length transaction a general duty of inquiry. *Id.* at *8. A party that elects to make an independent investigation will be accountable for "everything such party could have discerned by employing reasonable diligence." *Id.*

[9] Common law fraud must be established by clear and convincing evidence. *Square Two, LLC,* 2021 WL 851091, at *7.

[10] To the extent the District Court's finding that Afoluso intended Novartis to rely on her misrepresentations in her application and resume is not considered identical to the element of a § 523(a)(2)(B) claim requiring that the statement have been made with intent to deceive, this Court easily infers from the surrounding circumstances that Afoluso intended to deceive Novartis into hiring her and enhancing her compensation when she made statements about her employment and salary history which she knew were false on a job application and resume.

Additionally, the Court concludes that Novartis exercised the degree of care which a

reasonably cautious entity in the same position would have when it relied on representations

which Afoluso had certified were correct with awareness that falsification of information would

result in immediate dismissal and that employment was contingent on the completion of a

satisfactory background check.[11]

---

[11]     The inquiry regarding whether a creditor exercised the degree of care a reasonably cautious person in the same business transaction under similar circumstances would have is typically informed by consideration of three factors set forth in, *Insurance Company of North America v. Cohn (In re Cohn)*, 54 F.3d 1108 (3d Cir. 1995), by the Third Circuit Court of Appeals ("Third Circuit"):

> (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a 'red flag' that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations). *Cohn*, 54 F.3d at 1117.

*Cohn* does not dictate how the factors are to be weighed nor mandate that all factors be present to determine that an entity's reliance was reasonable. *See id.* Although the plain language of *Cohn* appears to limit consideration of the foregoing factors to situations involving an extension of credit rather than an employment relationship, the Court will nevertheless consider them in an abundance of caution to the extent *Cohn* could be construed to so require.

With regard to the first factor, Novartis's policy was that all employment offers were contingent upon the completion of satisfactory checks of the applicant's educational credentials, work history, references, and background. *See* Ex. 51 ("As with all employment tenders, this offer is contingent upon the successful fulfillment of certain company requirements including Novartis being able to verify educational credentials, work history information, and reference and criminal history checks."); Ex. 48 Dep. Tr. 91:1-92:18. Novartis utilizes a third party provider to perform background checks of employment candidates. Ex. 48 Dep. Tr. 91:1-11. In accordance with its practice, Novartis had a background check performed on Afoluso. Ex. 48 Dep. Tr. 91:22-92:8; Ex. B. There is no basis to conclude that Novartis veered from its standard practices in having that background check performed or that not contacting the current employer was not part of Novartis's standard practice. With regard to the second factor, neither party introduced expert testimony regarding industry practices in conducting background checks associated with hiring in the pharmaceutical industry.

With regard to the third factor, the surrounding facts and circumstances of the application would not have suggested Afoluso had made multiple false representations on her application and resume. First, there is no evidence of any previous relationship between Afoluso and Novartis which Novartis would have relied upon in hiring her or setting her compensation. Second, in terms of red flags, in finding that Novartis's reliance on the accuracy of the information provided in the application was reasonable, the District Court necessarily determined that the falsities in the application were not obvious. *See Square Two, LLC v. JJJ Solutions, LLC,* Case No. A-3065-18, 2021 WL 851091, at *7 (N.J. Sup. Ct. App. Div. March 8, 2021). In any event, although Afoluso's inclusion of "Target 30%" above the salary information for her then-current position may have been odd, that single reference alone would not have alerted Novartis to the multiple misrepresentations throughout her application, including those about phony supervisors, any other salaries which may have been inflated, or the fact that Global Drug had paid no salaries *at all* in *at least* 2009 and 2010, and had made almost no revenue for the entirety of its existence. Ex. 4 at 2; McCusker Decl. Ex. B, C; Ex. 49 Dep. Tr. 72:1-6, 91:18-20, 190:21-24. Furthermore, a minimal investigation would not have and did not reveal the inaccuracies on the employment application. Novartis did conduct a background check into Afoluso using a third party provider and it did not reveal any of the false information Afoluso had supplied. Furthermore, based upon the Court's assessment of Afoluso's credibility and her husband's obvious interest in his

Based on the foregoing, Novartis has established that Afoluso made materially false written statements respecting her financial condition intending to deceive Novartis upon which Novartis reasonably relied.[12] Therefore, all elements of a section § 523(a)(2)(B) claim are satisfied and the portion of the Judgment attributable to fraud on Afoluso's employment application and resume is nondischargeable pursuant to § 523(a)(2)(B).[13]

---

wife's employment and his own obstructive conduct in the District Court Action, even had Novartis as part of the background check contacted Global Drug, which had no employees, to verify her employment, the Court infers that Afoluso and Adenekan, the two sole co-owners of the business, would have verified her employment information falsely and not been forthcoming regarding the company's financial situation; the fact that it had not paid Afoluso a salary in at least 2009 or 2010; the fact that her "supervisor" was not actually an employee of the company; or any other salaries which may have been inflated. Ex. 4 at 2, 3; Ex. 49 at 53:3-6. Additionally, considering that Afoluso contradicted herself during the trial when attempting to explain to the Court what she meant when she wrote "Target 30%" on the application, as described *infra* note 12, the Court infers that even had Novartis questioned her about it, a truthful answer would not have been forthcoming.

   Based upon consideration of the foregoing factors, the Court still concludes that Novartis's reliance on Afoluso's representations in her employment application was reasonable and that it acted as a reasonable entity in its same situation would have.

[12] The Court found Afoluso's testimony regarding her intent in filling out the employment application incredibly confusing and completely lacking in any credibility. She contradicted herself on multiple occasions and could not provide a satisfactory explanation reconciling her testimony. At first, she testified that solely the "current" salary from Global Drug which she disclosed on the application was merely aspirational, despite Novartis's very clear request for current salary information, not aspirational salary information. Trial Tr. 138:6-139:25. Later, when confronted and pressed at trial about Global Drug having made no revenue in 2007 when she started working there, she insisted that she had been paid $220,000 as her starting salary and had paystubs reflecting that amount. *Id.* at 166:3-167:12, 170:12-23. However, she then changed her mind and claimed that the starting salary she had disclosed on her application was merely aspirational as well, despite just testifying that she had paystubs reflecting she had been paid $220,000 as her starting salary and testifying previously that only her current salary had been aspirational. *Id.* at 176:9-180:14. Adding to the confusion was her testimony that Global Drug, a company owned solely by Afoluso and her husband, had promised to pay her when it had money, and that she eventually did get paid, despite the company essentially making no money aside from investments made by Afoluso and her husband in an unknown amount somewhere in the "ballpark" of over $100,000, but that she had no idea how much Global Drug had paid her. *Id.* at 174:14-175:25, 178:10-21, 179:9-180:19. Accordingly, in light of the rampant inconsistencies in her testimony, the Court simply cannot credit her attempted explanation that all salary information relating to Global Drug was intended to be aspirational. In any event, she offered no explanation for the other false statements relating to her employment history which the District Court noted.

[13] To the extent that the false statements contained in Afoluso's employment application and resume do not relate to Afoluso's financial condition, the Court has no problem concluding that the findings made by the District Court relating to the fraud on Afoluso's employment application and resume satisfy the elements of § 523(a)(2)(A), which renders nondischargeable any debt for money obtained by a false representation. *See Mungo v. Casale*, Civ. Act. No. 96-6228, No. 96-6229, 1997 Dist. LEXIS 3867, at *14-15 (E.D. Pa. March 28, 1997) (a court may modify its interlocutory order at any time before the final decree). Succeeding on a § 523(a)(2)(A) claim based on a false representation requires proof that (1) the debtor made a false representation; (2) which at the time of the representation, the debtor knew or believed was false; (3) the false representation was made with the intent and purpose of deceiving the creditor; (4) the creditor justifiably relied upon the misrepresentation; and (5) the creditor sustained damages as a proximate result of the misrepresentation. *Green v. Didio*, 607 B.R. 804, 816 (Bankr. E.D. Pa. 2019); *Jou v. Adalian (In re Adalian)*, 474 B.R. 150, 160 (Bankr. M.D. Pa. 2012). Justifiable reliance is a less demanding standard than the reasonable reliance required under § 523(a)(2)(B). *Field v. Mans*, 516 U.S. 59, 70-72, 77 (1995). Under the justifiable reliance standard, a person may still be justified in relying on a representation even

### B.  The Portion of the Judgment Attributable to Afoluso's Breach of the Relocation Agreement Is Nondischargeable Pursuant to § 523(a)(2)(A).

Novartis avers that the portion of the Judgment attributable to the breach of the

Relocation Agreement is nondischargeable pursuant to § 523(a)(2)(A).[14] Am. Compl. ¶ 84. A

§523(a)(2)(A) claim based on a false representation requires proof that the debtor made a false or

misleading affirmative misrepresentation with the intention and purpose of deceiving the

creditor. *Green v. Didio,* 607 B.R. 804, 816 (Bankr. E.D. Pa. 2019). There are five elements

comprising a false representation claim under § 523(a)(2)(A) which must be proven by a

preponderance of the evidence: (1) the debtor made a false representation; (2) which at the time

of the representation, the debtor knew, or believed, was false; (3) the false representation was

made with the intent and purpose of deceiving the creditor; (4) the creditor justifiably relied upon

the representation; and (5) the creditor sustained damages as a proximate result of the

misrepresentation. *Green*, 607 BR. at 816; *Jou v. Adalian (In re Adalian)*, 474 BR. 150, 160

(Bankr. M.D. Pa. 2012).

---

though he might have ascertained its falsity had he made an investigation. *Id.* at 70. As discussed *supra,* the District Court specifically found in the First District Court Opinion that Afoluso's employment application and resume contained materially false representations about her employment and salary history; that she would have known those representations were false at the time she made them; that she intended Novartis to rely on those statements since she was trying to obtain employment; and that Novartis reasonably relied on her representations in light of the certification she signed on the application. Ex. 4 at 19. Those findings are essentially identical to the findings this Court would need to make to support a determination of nondischargeability under § 523(a)(2)(A), were actually litigated and decided, were essential to supporting the Judgment, and Afoluso had a full and fair opportunity to litigate them in the District Court Action. Accordingly, they are established by collateral estoppel. To the extent the finding relating to her intent is not identical to the finding this Court must make regarding her intent, the Court easily infers for the reasons discussed *supra* that she made those representations intending to deceive Novartis into hiring her and offering her an attractive compensation package.

[14] The Amended Complaint also asserted § 523(a)(2)(B) as an alternative basis for nondischargeability of the portion of the Judgment attributable to Afoluso's breach of the Relocation Agreement. Am. Compl. ¶ 84. However, this Court already determined in its Adversary Summary Judgment Opinion that "[t]he false representation at issue relates to Afoluso's intention to relocate rather than her financial condition. Therefore, the debt for money obtained by this false representation – the portion of the Judgment attributable to Count III – is within the scope of §523(a)(2)(A) as opposed to § 523(a)(2)(B)." Adv. Summ. J. Op. 30 n.13.

This Court already determined on summary judgment that Afoluso represented to Novartis that she intended to relocate closer to Novartis's offices in New Jersey; her representation that she would relocate turned out to be false; and based on her representation that she would relocate, Novartis extended Afoluso approximately $26,000 to its detriment, leaving for resolution at trial the following issues: (1) whether Afoluso knew her representation regarding her intention to relocate was false at the time she made it; (2) whether she purposely made that representation intending to deceive Novartis; and (3) whether it was justifiable for Novartis to rely on her representation that she intended to relocate. Adv. Summ. J. Op. 30-31. As mentioned *supra*, because a debtor will rarely, if ever, admit that deception was his purpose, intent to deceive and knowledge may be inferred from the totality of the surrounding facts and circumstances. *In re Robbins*, 562 BR. at 109; *In re Singh*, 433 BR. at 161.

The Court easily infers that Afoluso knew that she had no intention of moving at the time she signed the Relocation Agreement. Afoluso failed to identify a single meaningful action she took to initiate the relocation at any point during her tenure with Novartis. She had no recollection of researching schools for her children to attend; consulting a realtor to assist with selling or leasing the Residence or with finding a new home closer to New Jersey; visiting or researching potential towns or cities to relocate to; or consulting with Novartis's relocation vendor. Trial Tr. 74:2-16, 76:4-9, 76:19-25, 77:8-12, 77:23-78:1, 79:19-23. In fact, she did not even recognize the name of Novartis's relocation vendor when first asked about Cartus at trial. *Id.* at 77:13-19. The Court concludes that Afoluso did not recall taking any of the aforementioned basic steps because she, in fact, did not take any steps to move in accordance

with the Relocation Agreement, a conclusion which her responses to Novartis's discovery requests further support.[15] *See* Ex. 12 at p. 2 ¶¶ 4-5, p. 5 ¶¶ 2-3.

Ultimately, in the absence of any steps taken to attempt to move at any time during Afoluso's tenure with Novartis, there is simply no basis for this Court to conclude that she ever intended to move when she signed the Relocation Agreement.[16] Her lack of action is completely inconsistent with an intention to move and the Court concludes Afoluso knew she had no intention of moving at the time she signed the Relocation Agreement.

The Court also easily infers that Afoluso signed the Relocation Agreement intending to deceive Novartis in order to obtain additional compensation. Despite Afoluso's belief that she had twelve months to move pursuant to the Relocation Agreement, when the deadline came and went, she took no action to notify Novartis that she had not moved[17] and needed more time. Trial

---

[15] When asked to produce copies of any real estate listing agreements entered into between 2010 and 2017 for her Residence or copies of any offers to purchase or lease the Residence for 2010 through 2018, Afoluso responded "there are no listing agreements entered into by defendants…[and] there are no offers to purchase…" Ex. 12 at p. 2 ¶¶ 4-5. When asked to identify all realtors or real estate professionals contacted from 2010 through 2014 with regard to listing the Residence for purposes of selling or leasing it, Afoluso responded "none." *Id.* at p 5 ¶ 2. When asked to identify all properties in New Jersey for which Afoluso had placed an offer to purchase or lease in the time period of 2010 through 2014, Afoluso responded "none." *Id.* at p 5 ¶ 3.

[16]        The Court does not credit Afoluso's testimony that she always intended to relocate within twelve months of starting her job at Novartis but became too busy at work. *See* Trial Tr. 143:18-144:4. The Court would expect someone who had a genuine intention to move but became too busy to do so to reach out to the company's relocation vendor for assistance, to ask the company for more time to complete the move, to possibly have a family member or partner start the moving process, or start working towards moving after the work load reduced. It makes no sense that Afoluso would have intended to relocate, but found no time at all at any point during her three and a half years with Novartis to take even basic steps towards moving, especially when Novartis had a relocation vendor available to help her. Accordingly, her testimony does not convince the Court in the absence of evidence of *any* steps taken towards moving that she ever intended to relocate closer to Novartis. Moreover, Afoluso's self-serving attempt to justify an increase in Novartis's offer by referencing the increased cost of living the job would require in an email to her recruiter does not convince the Court otherwise in light of the totality of the circumstances, including the many misrepresentations she made on her application in order to get hired in the first place and obtain inflated compensation, and failure to take any steps to move closer to Novartis over several years with the company. *See* Ex. D. In any event, the Court already granted Novartis's pre-trial motion to strike that argument as an affirmative defense. *See* Am. Ans. ¶ 127; Case No. 19-00124 ECF 101.

[17] In April 2012, two years after Afoluso had accepted a job with Novartis, when human resources began requiring Afoluso to be present in the office more frequently, Afoluso informed Novartis that medical problems made it too difficult for her to commute to New Jersey. Ex. 4 at 5. In response, Novartis offered to provide her with additional relocation assistance to reduce Afoluso's commute. *Id.* That Novartis generously attempted to work with Afoluso to afford her additional relocation assistance so that she could be present in the office more frequently is not at all probative of Afoluso's intent in entering the Relocation Agreement.

Tr. 143:18-20, 144:11-17. Instead, she kept the approximately $26,000 that Novartis had given

her for the purpose of moving without actually making any efforts towards moving. *Id.* at 146:4-

14. The Court infers from her silence in the face of the relocation deadline and the fact that she

kept all of the relocation money without attempting to move that she entered the Relocation

Agreement for the purpose of obtaining additional funds for herself rather than for the purpose of

moving.[18] The Debtors' significant financial difficulties leading up to Afoluso applying for and

accepting a position at Novartis further supports this inference.

Finally, the Court finds Novartis's reliance on Afoluso's representation that she would

relocate completely justifiable given that her employment was predicated on her relocating, an

expectation clearly set forth even in her Offer Letter. Ex. 4 at 4; Ex. 51. Accordingly, based on

the foregoing, because Novartis has demonstrated all the elements necessary for a § 523(a)(2)(A)

claim, the Court finds the portion of the Judgment attributable to Afoluso's breach of the

Relocation Agreement nondischargeable pursuant to § 523(a)(2)(A).

### C.  The Portion of the Judgment Attributable to Afoluso's Breach of the Duty of Loyalty and Conflicts Policy Is Nondischargeable Pursuant to § 523(a)(2)(A).

Novartis avers that the portion of the Judgment attributable to the breach of the duty of

loyalty and Conflicts Policy is nondischargeable pursuant to § 523(a)(2)(A).[19] Am. Compl. ¶103.

This portion of the Judgment is based upon Afoluso's failure to disclose external employment

she obtained and held with other pharmaceutical companies during her tenure with Novartis in

---

[18] Although Afoluso claimed to not remember what she spent the relocation funds on, it is clear based on her inability to identify a single step she took to attempt to move that she did not spend it on relocation efforts. *See* Trial Tr. 146:4-14.

[19] The Amended Complaint also asserted § 523(a)(2)(B) as an alternative basis for nondischargeability of the portion of the Judgment attributable to Afoluso's breach of the duty of loyalty and Conflicts Policy. Am. Compl. ¶ 103. However, this Court already determined in the Adversary Summary Judgment Opinion that "[t]hese omissions/implied representations relate to conflicts of interest and Afoluso's work performance rather than her financial condition. Therefore, debt for money obtained by these omissions/implied representations – the portion of the Judgment attributable to Count VIII – does not implicate § 523(a)(2)(B) and is within the scope of §523(a)(2)(A)." Adv. Summ. J. Op. 35 n.28.

violation of her common law duty of loyalty to Novartis and Novartis's Conflicts Policy. Am.

Compl. ¶¶ 93-103.

A § 523(a)(2)(A) claim based on false pretenses requires proof of an implied

misrepresentation promoted knowingly and willingly that creates a misleading understanding of

the transaction with the plaintiff which wrongfully damaged plaintiff by inducing plaintiff to

advance money, property, or services to the debtor. *Carto v. Oakley*, 503 BR. 407, 432 (Bankr.

E.D. Pa. 2013); *LL Lifestyle, Inc. v. Vidal (In re Vidal)*, Bankr. No. 10-14071, Adv. No. 10-0335,

2012 WL 3907847 at *16 (Bankr. E.D. Pa. Sept. 7, 2012); *Oppenheimer & Co. Inc. v. Ricker (In*

*re Ricker)*, 475 B.R. 445, 456-57 (Bankr. E.D. Pa. 2012). As mentioned, because a debtor will

rarely, if ever, admit that deception was his purpose, intent to deceive, as well as knowledge,

may be inferred from the totality of the surrounding facts and circumstances. *In re Robbins*, 562

BR. at 109; *In re Singh*, 433 BR. at 161.

Certain elements of a § 523(a)(2)(A) claim based upon false pretenses have already been

established at the summary judgment stage by collateral estoppel, including: (1) Afoluso created

a misleading impression that she was performing full time work for Novartis by failing to

disclose her external employment for other pharmaceutical companies and (2) Novartis was

harmed by paying her for more than her services warranted. Adv. Summ. J. Op. 35. The only

issues left for resolution at trial were (1) whether Afoluso knew she was creating a misleading

impression by failing to disclose her external employment and (2) whether she purposely failed

to disclose her external employment intending to deceive Novartis. *Id.* at 36.

The Court easily infers that Afoluso knew she was creating a misleading impression by

failing to disclose her external employment to Novartis. On March 3, 2010, Afoluso

acknowledged by signing her Employee Agreement that during her employment with Novartis

she would devote her best efforts and full business loyalty to her employment with Novartis and that she would hold no other employment or engage in any other business which would adversely affect her ability to perform her job responsibilities. Ex. 52. Accordingly, she was aware from the very outset of her employment that she was prohibited from holding external employment of that nature. Despite this awareness, she still obtained and held external employment with other pharmaceutical companies throughout her tenure with Novartis without informing Novartis, for whom she was supposed to be working full time.

Furthermore, on January 27, 2012, the same month she secured employment with Astellas and under a year after securing employment with Biomedical and Auxilium, Afoluso received training on the 2011 Code of Conduct. The 2011 Code of Conduct clearly recites the portion of the Conflicts Policy prohibiting employees from having a second job with or providing services to a competitor of Novartis and from engaging in outside employment or other activities which encroach on time or attention which should be devoted to Novartis or detracts from the employee's ability to perform his or her responsibilities with undivided loyalty to Novartis. Ex. 83 at 3.[20] The Code of Conduct further imposes an obligation on employees to disclose any conflicts of interest and report any violations, and details the consequences of violating the Code of Conduct, including termination. *Id.* at 3, 5.

Based on the foregoing, Afoluso would have been *well* aware that her external employment violated the Code of Conduct, the Conflicts Policy, and her Employee Agreement,

---

[20] In post-trial briefing submitted by the Debtors, they seek to have exhibit 83 stricken from the record. They objected to this document at trial, and the Court determined that the document was relevant as one of the Codes of Conduct setting forth the Conflicts Policy and prohibition on certain external employment which Afoluso received training on during her time at Novartis while she was working external consulting positions. Trial Tr. 205:22-207:3. The document was authenticated by Novartis's human resources business partner, Megan Burley, based on her personal knowledge. *Id.* at 23:17-25:17. Accordingly, the Court sees no basis for striking this document from the record. Truthfully, the Debtors' post-trial brief is so confusing and rambling as to be virtually incomprehensible, and the Court genuinely does not understand on what other basis besides those expressed at trial the Debtors seek to have this document stricken. Finding no basis, the Court denies that request.

and that by failing to disclose her external employment, which she knew she was obligated to do under the Code of Conduct,[21] she was creating a misleading impression that she was in full compliance with the Conflicts Policy, Code of Conduct, and Employee Agreement and devoting her full efforts to Novartis when she was not. Accordingly, the Court concludes that Afoluso *knowingly* created a misleading impression to Novartis by failing to disclose her external employment with Biomedical, Auxilium, and Astellas.

The Court also easily infers that Afoluso *purposely* failed to disclose her external employment intending to deceive Novartis. Afoluso acknowledged by signing the Employee Agreement that not holding certain external employment was a condition of her employment with Novartis. Ex. 52. Additionally, the Code of Conduct which she received training on in January 2012 as outlined *supra* very clearly states that violations of the Code of Conduct and Conflicts Policy, such as holding certain outside employment, could subject the employee to termination and/or elimination of bonus and incentive pay. Ex. 83. Accordingly, the Court infers from the foregoing that Afoluso failed to disclose her external employment intending to deceive Novartis in order to avoid termination of her employment from Novartis or having to resign from her external employment. In fact, her insistence on working from home so frequently during a period in which she billed hundreds of hours to other companies further supports the Court's inference that she purposely hid her employment from Novartis, as working from home allowed her to work for the other companies undetected.

---

[21] Afoluso's testimony that she did not realize until a 2013 conflicts training that Novartis would expect her not to seek employment with other pharmaceutical companies is self-serving and simply not credible, especially given her extensive experience working for other major pharmaceutical companies which almost certainly would have had comprehensive conflicts of interest policies, and the overwhelming evidence that she read and understood the Employee Agreement and was trained on the Code of Conduct, both of which referenced the most salient aspects of the Conflicts Policy and prohibition on obtaining certain outside employment, prior to 2013. Ex. 52, 55, 83; Trial Tr. 121:5-19. Given the overwhelming evidence in Novartis's favor, Afoluso's conclusory, self-serving testimony that she did not remember seeing restrictions on external employment in the Code of Conduct until the 2013 training on the Conflicts Policy is not credible. *See* Trial Tr. 130:7-11.

Other circumstantial evidence reflecting Afoluso's financial difficulties, such as the commencement of a foreclosure action on her Residence during her employment with Biomedical and Auxilium and shortly before she obtained employment with Astellas, as well as the existence of several foreclosure judgments against the Debtors' properties which were entered prior to and during her employment with Novartis and before she obtained her external consulting positions, further supports the inference that Afoluso intended to deceive Novartis by hiding her other positions. Her financial difficulties would have incentivized her to maximize her compensation by keeping her external employment from Novartis so she could hold multiple jobs simultaneously.

Based on the foregoing, the Court infers that Afoluso knowingly created a misleading impression that she was in compliance with the Conflicts Policy intending to deceive Novartis by failing to disclose her external employment. Therefore, Novartis has satisfied all elements necessary to sustain a § 523(a)(2)(A) claim and the portion of the Judgment attributable to Afoluso's breach of the duty of loyalty and the Conflicts Policy is nondischargeable for false pretenses.

### D. All Except a Small Portion of the Judgment Attributable to Afoluso's Breach of the Annual Incentive Program Is Nondischargeable Pursuant to §523(a)(2)(A).

Novartis avers that the portion of the Judgment attributable to the breach of the AIP is nondischargeable pursuant to § 523(a)(2)(A).[22] Am. Compl. ¶ 92. This portion of the Judgment is based upon Afoluso receiving bonuses through Novartis's AIP for which she was ineligible on

---

[22] The Amended Complaint also asserts § 523(a)(2)(B) as an alternative basis for nondischargeability of the portion of the Judgment attributable to Afoluso's breach of the AIP. Am. Compl. ¶ 92. However, this Court already determined in the Adversary Summary Judgment Opinion that "[t]hese omissions/implied representations relate to violations of company policy and conflicts of interest rather than Afoluso's financial condition. Therefore, debt for money obtained by these omissions/implied representations – the portion of the Judgment attributable to Count IV – does not implicate § 523(a)(2)(B) and is within the scope of § 523(a)(2)(A)." Adv. Summ. J. Op. 33 n.22.

account of ongoing violations of the Conflicts Policy and Employee Agreement. Am. Compl. ¶¶85-92. Specifically, Afoluso's undisclosed ownership interest in Global Drug/LaRon rendered her in violation of the Conflicts Policy and Employee Agreement from the outset of her employment. Ex. 4 at 3, 20; Ex. 5 at 22-23. Additionally, Afoluso continued to violate these policies when she obtained external employment with other pharmaceutical companies during her tenure at Novartis. Ex. 4 at 20; Ex. 5 at 22.

As discussed *supra*, a § 523(a)(2)(A) claim based on false pretenses requires proof of an implied misrepresentation promoted knowingly and willingly that creates a misleading understanding of the transaction with the plaintiff which wrongfully damaged plaintiff by inducing plaintiff to advance money, property, or services to the debtor. *Carto*, 503 BR. at 432; *In re Vidal*, 2012 WL 3907847 at *16; *In re Ricker*, 475 B.R. at 456-57. As mentioned, because a debtor will rarely, if ever, admit that deception was his purpose, intent to deceive, as well as knowledge, may be inferred from the totality of the surrounding facts and circumstances. *In re Robbins*, 562 BR. at 109; *In re Singh*, 433 BR. at 161.

Certain elements of a § 523(a)(2)(A) claim based upon false pretenses have already been established on summary judgment by collateral estoppel, including: (1) Afoluso made omissions/implied misrepresentations regarding her conflicts of interest and compliance with Novartis policies by failing to disclose her ownership of another pharmaceutical company and external employment for other pharmaceutical companies in violation of her Employee Agreement and Novartis's Conflicts Policy; (2) due to these conflicts, Afoluso was not eligible for bonuses under the AIP at any point during her employment; (3) her failure to disclose these conflicts created the misleading impression that she was eligible for bonuses under the AIP when she was not; and (4) Novartis was harmed when it paid Afoluso bonuses she was not entitled to

receive. Adv. Summ. J. Op. 32-33. The following issues remained for resolution at trial: (1) whether Afoluso knew her failure to disclose her conflicts of interest created a misleading impression that she was eligible for the AIP when she was not and (2) whether she purposely failed to disclose her conflicts intending to deceive Novartis into giving her incentive pay. *Id.* at 34.

With respect to the portion of the Judgment for breach of the AIP attributable to the incentive pay Afoluso earned in 2011, the Court cannot conclude that she knew her failure to disclose her conflicts of interest created the impression she was eligible for the AIP when she was not or that she intended at that point to deceive Novartis into giving her incentive pay. Novartis simply did not produce evidence at trial demonstrating that Afoluso was aware in 2010 or 2011, when she initially started working for Biomedical and Auxilium, that she could specifically lose incentive pay by obtaining external employment or by holding other undisclosed conflicts of interest, even if she knew that she was prohibited from obtaining external employment or having other undisclosed conflicts of interest. As discussed *supra,* Novartis certainly produced evidence that Afoluso was aware from the outset of her employment that she was prohibited from holding external employment and that she read and understood the Code of Conduct in effect at the start of her employment. But, Novartis simply did not produce evidence at trial of the contents of that Code of Conduct and whether it referenced the implications to her incentive pay of obtaining external employment or not disclosing other conflicts.[23] Nor does her

---

[23] When the Court invited Novartis to submit the version of the Code of Conduct in effect at the time Afoluso commenced her employment, the Court envisioned that Novartis would authenticate the document with the affidavit of someone from Novartis with personal knowledge of that version of the Code of Conduct rather than an affidavit of counsel for Novartis. Without proper authentication, the Court cannot consider the supplemental submission of the Code of Conduct purportedly in effect at the time Afoluso commenced her employment with Novartis. *See* Fed. R. Ev. 901. Had *Afoluso* produced the supplemental exhibit in discovery in the District Court Action, the Court could have considered it. *See e.g., Shell Trademark Mgmt. BV v. Ray Thomas Petroleum Co., Inc.,* 642 F. Supp. 2d 493, 510 (W.D. N.C. 2009). But that does not appear to be the case.

training record reflect that Afoluso received training on the 2011 version of the Code of Conduct introduced at trial prior to 2012. *See* Ex. 55. Accordingly, the Court has no basis to conclude that Afoluso failed to disclose her external employment or other conflicts in 2010 or 2011 with knowledge that her employment and conflicts would disqualify her from receiving incentive pay, or intending to deceive Novartis into giving her incentive pay for which she did not qualify.

However, the Court easily infers that as of January 2012, after Afoluso received training on the 2011 Code of Conduct, Afoluso knowingly created a misleading impression that she was eligible for the AIP when she was not with the intent and purpose of deceiving Novartis into continuing to give her incentive pay when she failed to disclose the multiple external positions she held at that time, as well as the conflict of interest she and Adenekan had as owners of another pharmaceutical company. In addition to the prohibitions on external employment mentioned *supra*, the 2011 Code of Conduct also recites the portion of the Conflicts Policy prohibiting employees or their spouses from owning an interest in any company which competes with Novartis. It also states that employees must disclose any known violations of the Code of Conduct or Conflicts Policy and that violating these policies could result in the employee losing incentive pay. Ex. 83 at 5, 7.

Accordingly, at the very latest, after the January 2012 training on the 2011 Code of Conduct, Afoluso, who held three external pharmaceutical positions and an ownership interest in another pharmaceutical company at the time, was affirmatively aware that she had certain conflicts which violated the Code of Conduct and Conflicts Policy and which would disqualify her from receiving incentive pay like that she would receive under the AIP. Despite at that point knowing that she had an obligation under the Code of Conduct to disclose these conflicts to Novartis, she still hid them. *See* Ex. 83 at 3, 5. Based on the foregoing, the Court infers that as of

36

January 2012 after her training on the 2011 Code of Conduct, Afoluso knew she was creating a

misleading impression when she failed to disclose her conflicts of interest and did so, at least in

part with the intent and purpose of maximizing her compensation by maintaining her incentive

pay through Novartis, her ownership interest in her business, and her consulting positions.[24] The

foregoing inference is further supported by the financial difficulties discussed *supra* which

Afoluso was experiencing during her employment with Novartis, which would have incentivized

her to maximize her compensation as much as possible.

Having concluded that Novartis established by a preponderance of the evidence that from

January 2012, Afoluso knowingly concealed her conflicts of interest with the intent and purpose

of deceiving Novartis, the Court finds the portion of the Judgment attributable to Afoluso's

breaches of the AIP occurring subsequent to 2011 nondischargeable pursuant to § 523(a)(2)(A)

for false pretenses.

### E.  The Portion of the Judgment Attributable to the Sanctions Against Afoluso Is Nondischargeable Pursuant to § 523(a)(6).

Novartis avers the portion of the Judgment attributable to the sanctions against Afoluso is

nondischargeable pursuant to § 523(a)(6). Am. Compl. ¶¶ 104-08. This portion is based upon the

District Court's decision to sanction Afoluso in connection with false misrepresentations made

throughout discovery and her concerted effort to impede discovery. Ex. 4 at 6-7, 13-15. The

District Court sanctioned Afoluso pursuant to its inherent powers, which permits sanctions to be

issued when the Court finds that fraud has been practiced upon it. *Id.* at 9. As the District Court

---

[24] The Court finds Afoluso's conclusory, self-serving testimony that she did not know she was creating a misleading impression by failing to disclose her conflicts and did not intend to mislead Novartis is simply not credible. Trial Tr. 160:2-21. Similarly, the Court finds her self-serving testimony that she was not even aware of the AIP program at all to be completely not credible in light of the explicit reference to the AIP in her Offer Letter, which she signed on March 3, 2010, and the fact that she received substantial bonus payments once a year pursuant to the program. Ex. 51; Trial Tr. 159:4-7. *See* Ex. 5 at 23 (reciting that she had received $57,605 in 2011, $70,343 in 2012, and $82,455 in 2013 from the AIP). It would defy logic to believe that Afoluso would have had no idea of the source of such substantial payments or that she had received these *annual* bonuses through the *Annual* Incentive Program.

noted, fraud on the court occurs where it can be demonstrated by clear and convincing evidence

that "'a party has sentiently set in motion some unconscionable scheme' that interferes with the

court's ability 'impartially to adjudicate a matter by improperly influencing the trier or unfairly

hampering the presentation of the opposing party's claim or defense.'" *Id.*

Pursuant to § 523(a)(6), a debt for willful and malicious injury by the debtor to another

entity or to the property of another entity will not be discharged. To succeed on a § 523(a)(6)

claim, the plaintiff must prove by a preponderance of the evidence that the injury to the plaintiff

was both willful and malicious. *Beard Research, Inc. v. Kates (In re Kates),* 485 B.R. 86, 100

(Bankr. E.D. Pa. 2012). "The term 'willful' refers to a deliberate or intentional injury, not just a

deliberate or intentional act that leads to an injury." *Id.* "Actions taken for the specific purpose of

causing an injury as well as actions that have a substantial certainty of producing injury are

'willful' within the meaning of § 523(a)(6)." *Id.* "'Malice' refers to actions that are wrongful and

without just cause or excuse, even in the absence of personal hatred, spite or ill-will." *Id.* at 101.

A debtor may act with malice without bearing any subjective ill will toward the creditor or any

specific intent to injure the same. *Id.*

Afoluso's conduct upon which the District Court based its award of sanctions satisfies the

elements of § 523(a)(6).[25] First, the injury attributable to Afoluso's discovery misconduct in the

District Court Action was willful. The District Court found Afoluso "entirely culpable" for her

---

[25] As mentioned, *supra*, in the context of dischargeability proceedings, collateral estoppel permits the court to accept facts established by previous judgment as evidence of nondischargeability. *Wolstein v. Docteroff (In re Docteroff)*, 133 F.3d 210, 215 (3d Cir. 1997) (citing *In re Halpern*, 810 F.2d 1061, 1064 (11th Cir. 1987)). Upon application of collateral estoppel in a nondischargeability action, the Court must determine whether a judgment entered in a prior proceeding and the accompanying underlying findings are sufficient to render a debt nondischargeable. *Aiello v. Aiello (In re Aiello)*, 533 BR. 489, 494-95 (Bankr. W.D. Pa. 2015). The findings supporting the sanctions award discussed *infra* are identical to issues this Court would be required to determine, were actually litigated and decided in the District Court Action, were essential to supporting the Judgment, and were issues Afoluso had a full and fair opportunity to litigate in the District Court Action. *See United States ex rel. Doe v. Heart Solution, PC*, 923 F.3d 308, 316 (3d Cir. 2019); *Heine v. Comm'r of the Dep't of Cmty. Affairs*, 337 F. Supp. 3d 469, 482 (D. NJ. 2018).

"willful, determined effort…to deceive" Novartis and the District Court by committing perjury

multiple times, "brazenly" misleading Novartis counsel, and manipulating the judicial process

"in bad faith." Ex. 4 at 13, 14. In fact, the District Court determined Afoluso's false deposition

testimony and written discovery responses were *not* the result of forgetfulness or confusion. *Id.*

at 13-14. Rather, the District Court found "[s]he had every opportunity to tell the truth and

cooperate in discovery and chose not to." *Id.* at 14. Ultimately, The District Court found a clear

connection between Afoluso's discovery "obfuscation" and the very matters in controversy in the

District Court Action. *Id.* The District Court findings regarding Afoluso's conduct during

discovery in the District Court Action demonstrate that Afoluso's fraudulent scheme to mislead

and manipulate Novartis and the District Court was undertaken intentionally to injure Novartis in

its ability to prosecute its Counterclaims and defend against Afoluso's claims in the District

Court Action. Accordingly, based on the foregoing description of Afoluso's conduct, the Court

easily concludes that she acted deliberately and willfully with the specific purpose and intent of

injuring Novartis by manipulating the judicial process. The portion of the Judgment attributable

to the sanctions award against Afoluso is a debt for a willful injury.

Similarly, with regard to the second element, the injury attributable to Afoluso's

discovery misconduct in the District Court Action was malicious. Committing fraud, repeatedly

lying about matters in controversy during discovery, and withholding relevant evidence in a

"willful," "bad faith" effort to mislead the opposing party and manipulate the judicial process are

objectively wrongful and without just cause or excuse. *See* Ex. 4 at 13; *J & V Developers, Inc. v.*

*Malloy (In re Malloy),* 2016 U.S. Dist. LEXIS 63015, at *29 (E.D. Pa. May 11, 2016) (defending

an action without any underlying legal or factual support for the claims constitutes a malicious

injury.). Accordingly, the Court concludes that based upon the District Court's findings

underlying the sanctions award against Afoluso that the portion of the Judgment attributable to

that award is a debt for a malicious injury. Therefore, that portion of the Judgment is

nondischargeable pursuant to § 523(a)(6).

**F.  The Portion of the Judgment Attributable to the Sanctions Against
      Adenekan Is Nondischargeable Pursuant to § 523(a)(6).**

Novartis avers that the portion of the Judgment attributable to the sanctions award against

Adenekan for his false deposition testimony and discovery obstruction in the District Court

Action is nondischargeable pursuant to § 523(a)(6) which, as discussed *supra*, provides that a

discharge will not discharge an individual debtor from any debt for willful and malicious injury

by the debtor to another entity or property of another entity. Am. Compl. ¶ 119. An injury

cognizable under § 523(a)(6) is "forcing another person to expend unnecessary money and time"

such as by "engaging in deliberate and needlessly prolonged litigation." *Purser v. Scarbrough*

*(In re Scarbrough),* 516 B.R. 897, 914-15 (Bankr. W.D. Tex. 2014). Furthermore, abusing the

judicial process to cause unnecessary delay or harassment can serve as the basis for a finding of

willful and malicious behavior. *Id.*

Adenekan's actions in obstructing and interfering with discovery in the District Court

Action were indeed willful and malicious. There is no doubt based upon the District Court's

findings that Adenekan acted deliberately in withholding subpoenaed documents from Novartis

as demonstrated by his blatant attempt at hiding and concealing documents about LaRon by

falsely certifying he had none when, in fact, he had *thousands* located in his home. Doing so was

substantially certain to harm Novartis by either forcing it to spend more money and time

needlessly on other third party discovery or making it impossible to defend against Afoluso's

claims or present its own Counterclaims. Further demonstrating the intentional and deliberate

nature of Adenekan's obstructive conduct throughout discovery was his continued refusal to

40

produce the requested documents in the face of *two* court orders compelling him to do so,

knowing that if he did not, he could be subject to sanctions. *See* Ex. 4 at 7 ("On October 30,

2015, Mr. Adesanya was *again* instructed to comply, and this Court granted Defendant

[Novartis] leave to file for sanctions for fees if Mr. Adesanya did not do so.") (emphasis added);

*In re Malloy,* 2016 U.S. Dist. LEXIS 63015, at *28. Even through the date the First District

Court Opinion was issued, he *still* never produced the documents despite being given multiple

opportunities to comply. Ex. 4 at 7. His false deposition testimony only further reflects

Adenekan's intent to injure Novartis by making it substantially more difficult for Novartis to try

its case and gain needed, relevant discovery.

   As the District Court mentioned in both District Court Opinions, sanctions may be

assessed against a responsible person when the very temple of justice has been defiled or fraud

has been practiced upon the court by setting in motion an unconscionable scheme to unfairly

hamper the presentation of the opposing party's claim or defense. Ex. 4 at 9; Ex. 5 at 7. Based on

the totality of the foregoing conduct, it is clear that Adenekan by submitting false certifications,

giving false testimony, and refusing to produce documents requested by subpoena even after

being ordered twice by the District Court to do so engaged in a deliberate and intentional scheme

to prevent Novartis from obtaining discovery it needed to present its case, conduct which was

substantially certain to cause injury to Novartis, rendering that conduct willful for purposes of

§523(a)(6). Furthermore, there is no just cause or excuse for intentionally undertaking an

"unconscionable scheme" to defraud the Court and Novartis by obstructing Novartis's discovery

through a false certification regarding requested documents, false testimony, and repeated

defiance of multiple court orders, rendering the conduct and scheme "malicious" for purposes of

§ 523(a)(6). Accordingly, the portion of the Judgment attributable to the sanctions against

Adenekan is nondischargeable for willful and malicious injury.

**IV.     CONCLUSION**

Based upon all the foregoing, the Judgment is nondischargeable pursuant to

§§523(a)(2)(A), 523(a)(2)(B), and 523(a)(6), except for the $57,605 attributable to Afoluso's

2011 breaches of the AIP.

Date: July 14, 2021

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge